Gerald BONE, by his wife, Wanda Bone, Appellant,

v.

DANIEL HAMM DRAYAGE COMPANY and State Treasurer, as Custodian of the Second Injury Fund, Respondent.

No. 54279.

Supreme Court of Missouri, Division No. 1.

Jan. 12, 1970.

John C. Danforth, Atty. Gen., Jefferson City, Mo., Gene R. Spengel, Jr., Asst. Atty. Gen., St. Louis, Mo., for State Treasurer, respondent.

Harry J. Nichols, St. Louis, Mo., for appellant.

HIGGINS, Commissioner.

Gerald Bone claimed compensation from his employer, Daniel Hamm Drayage Company, and its insurer, American Mutual Liability Insurance Company, for traumatic amputation of his right foot on June 12, 1963, and from the State Treasurer of Missouri, Custodian, Second Injury Fund, on account of that injury and pre-existing permanent partial disability. A compromise settlement of 170-weeks' compensation was made between the employee, his employer, and its insurer, which terminated the claim with respect to the injury sustained June 12, 1963. The claim against the Second Injury Fund was left pending and, on March 25, 1965, while the claim was pending, Mr. Bone died and his widow and only dependent, Wanda Bone, amended and proceeded with the claim. Referee H. J. Miller, Jr., of the Division of Workmen's Compensation, entered an award of $2,975 in favor of Mrs. Bone against the Second Injury Fund, and the Industrial Commission affirmed and adopted the referee's findings and award. Upon appeal to the circuit court, the custodian of the Second Injury Fund obtained a reversal of the award, and the claimant has appealed to

this court. Grant v. Neal, Mo., 381 S.W. 2d 838; Stewart v. Johnson, Mo., 398 S. W.2d 850.

The statute applicable to Second Injury Fund claims, Section 287.220, V.A.M.S., provides that if an employee "who has a permanent partial disability, whether from compensable injury or otherwise, receives a subsequent compensable injury resulting in additional permanent partial disability so that the degree or percentage of disability caused by the combined disabilities is greater than that which would have resulted from the last injury, considered alone and of itself, * * * the employer * * * shall be liable only for the degree or percentage of disability which would have resulted from the last injury had there been no preexisting disability," and the remainder shall be paid from the Second Injury Fund. The fund is maintained from a portion of the proceeds of a tax on insurance carriers under Section 287.710, V.A.M.S.; and the purpose of the Second Injury Fund law is to encourage employment of the partially handicapped where, prior to the law, the employer was obligated to pay all compensation awarded an employee. Stewart v. Johnson, supra, 398 S.W.2d 1. c. 853[3–5].

The findings of Referee Miller, pertinent to application of the statute, and affirmed and adopted as the findings and award of the Industrial Commission, are: "that on or about June 12, 1963, Gerald Bone * * * sustained an accidental injury * * * resulting in the loss of the right leg below the knee for which he would have been entitled to 176 weeks of compensation plus disfigurement. * * * that on June 29, 1965, compromise settlement was entered * * *.

"The subject of the present hearing is the employee's claim against the Second Injury Fund * * * pursued by his widow, Wanda Bone, on the theory that she is entitled to recover the compensation which would have been due to the employee had he lived * * *.

" * * * It appears to the Referee * * * that dependents should stand in the same shoes as a deceased employee, and that * * * a widow could recover compensation which would have been due to her deceased husband had he lived, using as authority * * * Section 287.020 (V.A.M. S.).

" * * * that at the time of the employee's accidental injury he had been suffering from a severe circulatory disability due to arteriosclerosis for which he had been receiving constant medication * * *. This disability was evaluated by Doctor Franklin as being more severe than the results of a ruptured disc and a laminectomy, and * * * the employee eventually died from this condition. * * * also * * * he had had a serious operation which involved the removal of one of the lobes of his lungs which condition was certainly disabling. I evaluate all of these previous disabilities at 40 per cent of 400 weeks or 160 weeks of disability. * * * the combination of this 160 weeks of pre-existing disability and the 176 weeks of disability resulting from the employee's accidental injury combined to have given the employee an overall disability greater than the sum of each individual disability considered alone and of itself. The loading factor between these disabilities which is the responsibility of the Second Injury Fund I evaluate at 70 weeks of compensation (70 x $42.50 = $2,975), and * * * this compensation would have been due to the employee at the time of his death, and that the right to recovery of this compensation has passed on to his widow, Wanda Bone."

In its judgment vacating the award, the circuit court found "there was not sufficient or substantial disability prior of June 12th, 1963, to sustain the award of the Industrial Commission."

■ Circuit and appellate courts are limited in review of an award of the Industrial Commission to determining whether findings of the commission are supported by competent and substantial evidence;

and whether the commission could reasonably have reached its result upon consideration of all the evidence in the light most favorable to the award and, if so, they may not substitute their judgment for that of the commission. Wood v. Wagner Elec. Corp., 355 Mo. 670, 197 S.W.2d 647, 649[1–5]; Conley v. Meyers, Mo., 304 S. W.2d 9, 10[2]; Jacobs v. Bob Eldridge Const. Co., Mo.App., 393 S.W.2d 33, 35[2, 3].

Dr. Harold A. Franklin, a physician specializing in internal medicine, first saw Gerald Bone in October, 1951, for a duodenal ulcer for which he subsequently treated him. In 1956 he began treating Mr. Bone for high blood pressure and arteriosclerotic heart disease which he continued until Mr. Bone's death by myocardial infarction March 25, 1965. The myocardial infarction was related to the arteriosclerotic heart condition which, in itself, was a permanent, irreversible condition. The condition was ameliorated during its course by digitalis and medications designed to reduce blood pressure. During the period 1956 to 1965, and on June 12, 1963, Mr. Bone was under the supervision of Doctor Franklin. Doctor Franklin stated that Mr. Bone had disabilities of shortness of breath and chest pain upon exertion as a result of his heart condition. He was limited in his ability to do anything requiring excessive pumping of blood and was subject to having a clot form at any time which could result in his death. In 1962, Doctor Franklin was treating Mr. Bone for a lung abscess which resulted in referral to Doctor Gillespie who, in April 1962, removed about a third of the left lower lobe which permanently decreased his lung capacity about a fifth to a sixth. This further decreased Mr. Bone's ability to breathe at times of exertion. He was aware of the construction-type work his patient did and was "always after him to slow down." The heavy work he did while he had his heart and lung conditions was a precipitating cause of his death. When he saw Mr. Bone in May, 1963, prior to the leg injury in June, 1963, "he had enough heart disease and lung disease to be partly disabled. * * * it would be more serious than a man who had a laminectomy because it was threatening to life, but how much it hampered him from minute to minute is just a variable sort of thing. He might be at the end of the day more short of breath than someone else, coughing and so forth, but he might still have done his job. In other words, he could do a hundred per cent of his job, but he might feel sixty or seventy per cent as good about it. Whereas a man with a laminectomy might not have been able to do the whole job. So this is a functional incapacity that you could push yourself and do the job even though maybe you shouldn't." Doctor Franklin acknowledged that his patient was doing well with his heart condition and following his lung surgery with the qualification, "You have to understand this means doing well for a man who is sick."

Mrs. Bone married Gerald May 12, 1961, and they had no children. At that time he complained of pain in his neck and shoulders. His complaints depended on the type work he was doing. When his work as an ironworker was heavy and caused "a lot of pulling, and tugging and climbing, something like that then, it would bother him." This would occur "a couple times a month" and she would apply a hot pad and "rubs" and give him aspirin. Following his lung surgery and up to the time he lost his leg, "it was hard for him to work because of this lower portion of his lung being repaired and he had this scar * * * it was hard for him to breathe."

Records of the Division of Workmen's Compensation showed that Mr. Bone sustained an accident September 14, 1959, and was paid $1,500 compensation in a compromise settlement for injury to head, ears, neck, and left shoulder.

Also shown by record was the traumatic amputation of Mr. Bone's right foot in the accident of June 12, 1963, and the subse-

quent hospital treatment, care, and amputation of the right leg below the knee. He did not return to work after the amputation.

■ The percentages of disability found by the commission are not disputed; only the evidence to support any pre-existing permanent partial disability is in question. The statement demonstrates substantial and competent evidence to show that Mr. Bone sustained a compensable injury during the course of his employment June 12, 1963, resulting in amputation of his right leg below the knee; that at that time he had pre-existing heart, lung, and neck and shoulder conditions and injuries which constituted pre-existing permanent partial disability because they made his work more dangerous to health and harder than the same work would be to a nondisabled person, and that the combination of such pre-existing permanent partial disability and his leg injury showed more disability than either condition when considered separately. The commission's award is thus supported by competent and substantial evidence and neither the circuit court nor this court could, under the rules, make a different and contrary finding. Howe v. Morris, Mo., 426 S.W.2d 353, 355[1–3]; Cole v. Morris, Mo., 409 S.W.2d 668, 671[6–8].

The circuit court relied on and respondent cites Meilves v. Morris, Mo., 422 S.W.2d 335, which reversed a judgment affirming an award against the Second Injury Fund and remanded the claim with directions to the commission to offer an opportunity for claimant to supplement the evidence, if possible, to show industrial disability prior to the injury. That case is not in point because, by contrast, and as demonstrated, this record contains substantial and competent evidence to support the finding by the commission of pre-existing permanent partial disability necessary to an award against the Second Injury Fund. Respondent also cites Wilhite v. Hurd, Mo., 411 S.W.2d 72, which is also different because there was no award against the

fund and the claimant was unable to demonstrate evidence to prove a pre-existing disability as opposed to simply showing prior conditions without showing how they constituted or resulted in the pre-existing permanent disability or "industrial disability" in relation to the work being done by the claimant at the time of his injury necessary to an award against the Second Injury Fund. Wilhite v. Hurd, supra, 411 S.W.2d l. c. 77–78[3, 4].

■ Respondent contends that even if the pre-existing permanent partial disability necessary to an award against the Second Injury Fund is shown, the judgment of the circuit court reversing this award should be affirmed because a claim against the Second Injury Fund dies with the employee and an allowance from it to a surviving dependent is erroneous and contrary to law. In urging this contention, respondent cites Section 287.230, V.A.M.S., which provides that death of an injured employee "shall not affect the liability of the employer to furnish compensation as in this chapter provided, so far as the liability has accrued and become payable at the time of the death, and any accrued and unpaid compensation due the employee shall be paid to his dependents"; and "where an employee is entitled to compensation under this chapter * * * and death ensues for any cause not resulting from the injury for which he was entitled to compensation, payments of the unpaid accrued compensation shall be paid, but payments of the unpaid unaccrued balance for the injury shall cease and all liability therefor shall terminate unless there are surviving dependents * * *." Respondent argues that this statute intends only that liability of an employer is not affected by death of an employee and that it is not intended to apply to continue liability of the Second Injury Fund after death of the employee.

This presents a question of first impression in Missouri. Respondent would support his position with Subsequent Injuries Fund v. Industrial Acc. Comm., Calif., 151

Cal.App.2d 147, 311 P.2d 42, which construed California Labor Code, Section 4700, similar to Section 287.230, V.A.M.S., to reach the result urged by respondent. However, there are significant distinctions between the Workmen's Compensation Act of California and Chapter 287, V.A.M.S., governing workmen's compensation in Missouri, and those distinctions require rejection of respondent's contention and authority.

 The general rule, 99 C.J.S. Workmen's Compensation § 149, page 516, is that dependents of an injured employee are not entitled to compensation during the employee's life, and they succeed to the employee's right to disability compensation on his death only to the extent provided for by statute. The California court, in construing its counterpart to Section 287.-230, V.A.M.S., did not have the additional provisions of the Missouri act bearing on the issue of survival. By Section 287.020, V.A.M.S., " 'employee' as used in this chapter (Chapter 287, Workmen's Compensation) shall be construed to mean every person in the service of any employer, as defined in this chapter * * *. Any reference to any employee who has been injured shall, when the employee is dead, also include his dependents, and other persons to whom compensation may be payable"; and "employee" is used without any qualification in Section 287.220 in providing for disability against the Second Injury Fund. Section 287.580, V.A.M.S., provides that "if any party shall die pending any proceedings under this chapter, the same shall not abate, but * * * may be revived and proceed in favor of the successor to the rights or against the personal representative of the party liable, in like manner as in civil actions." Under Section 287.800, V.A.M.S., these and all provisions of Chapter 287 "shall be liberally construed with a view to the public welfare and substantial compliance therewith shall be sufficient to give effect to rules, regulations, requirements, awards, orders or decisions of the commission * * *."

Accrual of Gerald Bone's right to compensation is not questioned, and the commission's finding that his dependent widow, Wanda Bone, succeeded to that right is intended and authorized under the cited sections of the Missouri Workmen's Compensation Act.

Accordingly, the judgment of the circuit court is reversed and the cause is remanded with direction to the circuit court to enter a judgment affirming the award of the Industrial Commission in favor of Wanda Bone against the Second Injury Fund.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

SEILER, P. J., HOLMAN, J., and HENLEY, Alt. J., concur.

STORCKMAN, J., not sitting.